Please call the next case. Case number 4-13-0298, P.A.M. Transport v. Workers' Compensation Commission. Counsel, you may approach. Good morning, Your Honors. Counsel, my name is Warren Deans and I'm here for a claimant, Mark Lommelino. I'd first make a note that Mark Lommelino unfortunately passed away during the course, leaving his wife and a 13-year-old daughter, and we've filed a notice of death in this case. Yes, and a motion for substitution. Right. And that motion will be granted. Thank you, Your Honor. And note that it's granted without objection by opposing counsel. Briefly, the background of the case is that this case was heard. The arbitrator awarded TTD, medical, and 50% of a home and for the petitioner who had three surgeons. The case was appealed to the commission. The commission reversed and awarded 75% of a home and based upon the three doctors that were admitted. Went to the circuit court and the circuit court reversed the commission on the finding of currency and reinstated 50% stating that the 75% was against the manifest weight of the evidence. We believe that this is incorrect and that's the basis of my appeal. You only asked to have it increased to 60%, didn't you? When you were before the commission, what was your request? No, I think we may have asked for it. I may have made a statement 60%. I asked for total permanent disability. No, I understand that, but you said based upon the finding that he was permanently disabled, you were asking to have it upped from 50% to 60% and the commission gave you 75%. That may be true, but I also, I know, argued that I thought it was total permanent disability, although my client didn't really go through the proper procedure, you know, to establish that. But be that as it may, I mean, you know, Mark Longolino was injured. He had a surgery with Dr. Winkes or a C5-C6 fusion. It didn't take care of the problem. He went repeatedly back to his family doctor, went to different physicians, and they said give more therapy. He went to Fletcher. He said more therapy. He went to Dr. Pinchik. Pinchik said you're not an MMI. You need more treatment. Finally, Dr. Lowell Brown sent him to Dr. Rue on 4-20-99. Dr. Rue examined him and noted that there was two EMGs that were positive for left nerve root irritation at C6. That was Trudeau. It was 97-99. He had an exam which showed atrophy of the left arm, an absent bicep nerve muscle, also a sensitivity to touch. He ordered another monogrammed CT, and he diagnosed C4, C5, C6, C7. He did a surgery. His first surgery was on July of 99. He went in from the back, and then in order to stabilize, he went in the front on February 2nd of 2000 for his second surgery. That's a total of three surgeries for Mr. Lamalina. And Dr. Rue finally in May of 2000 released him with a permanent restriction of 50-pound lifting, 30-pound overhead. He was also seen by Dr. Bancel, and that evidence was presented of 10-pound restriction, sedentary work only. He was also seen by Dr. Banbon, who stated that he was capable of sitting in a chair, answering the phone. So obviously your position is there's sufficient evidence in the record to support the commission's decision, correct? That's right. So how did it go off the tracks? What did the circuit court say was the reason for setting aside the commission's decision? Well, this kind of puzzles me, but if you look at the circuit court judge, he stated that there was a comment made by Dr. Rue that he will also need eventually have surgery at different levels. That's back in 2002, right? Right. Okay. And if you'll note in the commission's decision on review, they stated that based on the evidence of Dr. Rue, Dr. Bancel, and Dr. Banbon, that that was the basis of their opinion and their decision to increase the award to 75% of all men. I mean, isn't this essentially a battle between Banbon and Bancel saying this man can't do anything but sedentary work, he'll never drive again, and Dr. Wachaser who says he's malingering, he's fake on this. I mean, and the commission chooses to believe Banbon and Bancel. Well, that's the way I look at it, but here's the other fact. You've got to look at the whole picture. He went to Trudeau in the meantime after Wachaser had two positive EMGs. He had a positive monogram CT. He had atrophy in the left arm. His neck was twisted this way, which Dr. Rue said that one of the vertebrae had collapsed, causing him to walk like with his neck to the side. And he was a truck driver his whole life, never had a problem before. And when you look at all that, Dr. Rue looked at it all and he tried, you know, to do what he could do with the additional surgeries to correct the situation. When he said he will eventually need surgery at the other levels, that's understandable because if you have fusion that way, you put that much more stress on the other levels. So all I'm saying is the standard of review here is manifest with the evidence. Once the commission reviewed it, the commission made a thoughtful finding of the facts and increased it to 75 percent of a woman. I ask that the court review that and reinstate the commission's decision of 75 percent of a woman and the balance of the decision on the medical and on the TTD was affirmed even by the circuit court. That's basically my argument. Thank you. Thank you, counsel. Counsel, you may respond and present your cost appeal. May it please the court, counsel. I'm Bob Muller on behalf of PAM Transport, DBA, Allen Freight. I probably should start with responding to what Mr. Dan said to say rather than how I was going to start. The question with regard to the permanency here comes down to the commission indicating in their decision that they were in part basing this increase from 50 to 75 percent on the fact that Dr. Rue indicated that this guy might need surgery in the future. And my argument at that time and today and in my brief is that is pure speculation. And in fact, at the time we tried this case, Mr. Lamolino had not undergone another surgery. All right, counsel. So let me just pick up on that. And this is from your brief and it's somewhat of a long passage, but I want to read that because I think this is framing the issue here. You write, the argument is that Dr. Rue indicated that for sure the claimant would need surgery in the future, not that he may or may not. However, the note from Dr. Rue indicates, quote, I believe that he is eventually going to need surgery at the adjacent levels, but not at this point, close quote. In other words, Dr. Rue was certainly not saying that this was a medical certainty, something that was going to happen for sure. He was indicating what his belief or thought was about the future. This is exactly the speculation and conjecture that has no business being in a decision by the commission regarding how much permanent partial disability the claimant is entitled to. What is wrong with the opinion expressed by Dr. Rue in his notes? He's entitled to his belief. My point is that does not... I mean, shouldn't that be considered non-speculative? Well, I disagree with that. You say that it has to be with certainty? Are you suggesting that the opinion... What he's talking about is the possibility in the future, and to me that is speculation. He did not say I'm absolutely certain this guy in two years is going to need this surgery because of these facts. He didn't say that. He said I believe he's going to need this in the future. I don't want to get too philosophical, but can anyone ever testify as to what's going to happen in the future with certainty? No. Or is it always speculation? It may be educated speculation, but it's still speculation. But the commission should not be basing their decision on that speculation. We know that the commission thinks it's omniscient, but they still have to talk about what happens in the future. Well, I disagree, again, respectfully, Your Honor, because this guy can come back in seeking additional benefits, as I'm sure you are aware, under the workers' compact. They're supposed to award him benefits at the time of the hearing based on his condition at that time, not speculation as to what it might be in the future. That's where the other... You used the word speculation. I'm sorry, I missed the first part, I apologize. You used the word speculation, and what has happened to the term reasonable degree of medical certainty? Isn't that what medical opinions are always couched in when doctors are asked to express an opinion about what's to happen in the future? I mean, have you ever encountered a doctor that indicates this is what will happen in the future with certainty? I mean, to me, that would be an extreme rarity. I would agree with that. Now, first of all, as you brought up reasonable degree of medical certainty, that was not involved in Dr. Rue's statement. This is from... With his treatment records, though. Right, it's in his treatment records, but it doesn't... I mean, I don't know if this matters or not, but it does not say reasonable degree of medical certainty. He's a pretty savvy doctor to throw that language into the treatment records, don't you? Yeah. But that would be what is called foreign testimony, right? And that's just an illustration of why you would very rarely find a doctor testifying to absolute certainty. No, I think that's true. But again, my point is, Your Honor, that the commission is supposed to base their decision on everything, but including permanency, on the man's condition now. Because he has the opportunity to come in later if his condition deteriorates and seek additional benefits. I'd like two propositions that I have difficulty with on this particular issue. One that suggests we are required to give extreme deference to the commission when we deal with nature and extent. There is supposed to be absolute expertise in this issue, and that's where we give them the most deference, is in nature and extent. This really is a nature and extent problem. And the second one is, we can affirm the commission for any reason in the record. Mr. Gantz peels off an avalanche of medical evidence that this man will never drive again, he cannot do anything other than sedentary work, and to the opposite end of the coin, you've got one guy that says he's a millinger. And, you know, his evidence doesn't stand up real strong against this guy's medical treatment. I mean, if he's a millinger, he must love pain, because he's had some pretty serious operations. And even if we were to say that the opinion was weak, because it didn't say it was within the degree of medical certainty, in the face of all the rest of this reason, why shouldn't we just affirm it for that reason? Well, obviously you could do that, but what the circuit judge indicated was that the commission increased the award based on the speculation, not on everything else. Hold on one second. Do we even care what the circuit judge did? We're reviewing the decision of the commission, and our question is, is an award of 75 percent of a man as a whole against the manifest weight of the evidence based upon the evidence in the record? In an appeal from the circuit court in a workers' compensation action, we really don't care what the judge did, other than it may affect our judgment when we reverse it, or if we were to reverse them. But the fact of the matter is we review the commission's decision, don't we? Right. And let me just say, Dr. Rue provided this man with restrictions in the year 2000, and it was determined that he could go back to work at that time as a truck driver. But subsequent to that, the circuit doctor said no. But the claimant said that he had had no change in Dr. Rue's restrictions since the year 2000, when he saw him for the last time in 2004, and the claimant testified that his condition was the same at the present, when he testified, as it was in 2004, which leads me to believe his condition is the same. Let me ask you a question. When did Dr. von Bonn see him, and what did he have? March of 2008. 2008, you've got a doctor saying, this guy can never work again. He'll never drive a truck again. But that's contrary to the testimony of Mr. Lommelino. If he says he's basically in the same condition as he was in 2004, My question is, on a question of evidence, on the extent of an individual's injury, are you going to believe him or are you going to believe a doctor to tell you what his extent is? I think you're going to believe the doctor. When the doctor says, the guy may turn around and say, hey, I think I can work, and the doctor says, no, you can't. He just simply can't work. We're talking, in my mind here, we're talking about Dr. Rue, which is a whole different issue, maybe. But he's a treating doctor, and he gives the guy these restrictions, as opposed to Dr. von Bonn, who's a pulmonary specialist, who sees this guy in 2008, after all these years, at the request of Mr. Lommelino's attorney and gives this opinion. Counsel, as we go around and around about this, let me ask you a point of question. Can we agree it's up to the commission? It's their responsibility to weigh the evidence, to weigh the credibility and believability of the evidence, correct? Isn't that the commission? Sure, of course. We can agree on it. That's a matter of form book law. So then how do you respond to the charge here that the circuit court basically substituted its judgment for that of the commission on the weight of the evidence? How do you get around that? The commission relied upon speculation and conjecture in Dr. Rue's office note regarding what's going to happen in the future. And to me, my opinion is that's inappropriate. You do not put that into your reasoning and increase the award of competency based upon that. Because of the way the question was phrased, that's where the speculation and conjecture comes from. It's the future. I mean, yes, it is partly the phrasing, but it's also... He's talking about potential for future condition, is what you're saying. Right. It's what those notes can reasonably be interpreted to be. Right. And you're saying there's a provision in the act, or if that ever became reality, that the claimant could seek compensation for that level of poor condition at that time. Within a certain timeframe. That was my next question. There is a limit on that. No, that's right. He's able, and that limit continues to be extended appropriately, but he has the opportunity to come back in. And what is that limit presently? 60 months. I'd like to address a couple other issues if I could. I'd like you to address the average weekly wage issue. Okay. And how do you distinguish the scourging case? Well, I just think it's completely different from this case, because they were taking a big... It wasn't three cents per mile, like in this case. It was half the guy's earnings they were putting into the per diem category, I guess. To me, it's totally different from this case, where this is a small amount. It's not half. They're not avoiding taxes on half of what they're paying the guy. This is, to me, again, a legitimate amount to set aside for the per diem. And my point and my argument is this guy should have come in with expenses that are supposed to be what the per diem offsets to establish, if any of that per diem is over and above those expenses, to be included. Wasn't he awarded two in his statement? He got $2,888.20 for actual expenses where he submitted bills, and he got a per diem of $3,170.34 that went on without any bills, without anything, anything. Why isn't the per diem a financial benefit to him? It might be included under swearing. It might be, but he has to prove that. That's what the case I cited. Well, Swearingen doesn't say that. What Swearingen says is if the per diem is paid to him without any reference to actual expenses, then it's a financial gain to him and it should be included within his average weekly wage. In this case, he had two counts, one where he actually submitted expenses and one where he had per diem. If your argument is that he gets included any amount for which he doesn't provide expenses, why not combine the two totals and say he doesn't get $2,888.20 included in his average weekly wage, but he gets $3,170.34? Well, we didn't have testimony about it, Your Honor. Well, you did about what there was expenses for. But what's the difference between what he got reimbursed for and what the per diem? We didn't have testimony about the difference between those two. I'd be happy to speculate about that, but we did not have testimony about it. You had testimony that he had to submit vouchers for the $2,888.10. I don't know that there was testimony, but it seemed likely that happened based upon the documentary evidence, yes. And if you get money that you only have to submit expenses for and you get the same amount of money all the time, why isn't that an economic gain rather than a reimbursement for expenses? Well, it bothers me that he gets to include it as average weekly wage but then have to pay taxes on it. He should be paying taxes on it, but they don't take any money out of that. And that was the evidence. That may very well be true, but that's a matter for the IRS. I know that, but the point is in the United Airlines case, they said the guy should have come in and brought in expenses, what his expenses were that went against the per diem, and the difference would be included in his average weekly wage because that is benefit to him. And the point was they knew this guy, in that case, and this guy here too, has expenses. He has over-the-road expenses. They're not reimbursing him for all of the expenses he has if you take a close look at what he did get reimbursed for. That's not all the expenses he would incur as an over-the-road truck driver, and he's interstate. Yeah, both those decisions created this incentive for him to do that. Right. And that's the last thing because it raises the wage. Right. No, I understand that, but he doesn't want to pay taxes on it, but it shouldn't be added into his average weekly wage for a case like this either. The one thing I wanted to say, I don't know how much time I have left, probably not a whole lot, but I wanted to start out, what I was going to start out with was the premise that Mark Lomolino never wanted to go back to work after he got hurt. He apparently thought it was his ticket to retirement. He made no attempts to return to work. He did not cooperate with rehabilitation when we offered it to him at all, and I think, as I've said in my brief, based upon all of that, his entitlement to TTD should be drastically reduced. He should not be entitled to those benefits for that long period of time where he sat around doing nothing, never looked for work, in addition to not cooperating. The rest is sold. Thank you, counsel. Mr. Dan, you have a fine response. Briefly, in regards to the commission's decision on 75%, it appears to me that the commission cited Dr. Rood, Dr. Bonbon, and Dr. Mansell, all of which supported at least 75% or more. I think the commission probably would have given us a total permit, although for some reason Mr. Lomolino didn't do his job searches and so on and so forth because he said he was in too much pain, which may well be the case. So I don't understand the issue that Dr. Rood said, you may need surgery in the future. That's understandable, and maybe he will. But I don't think the commission – that's not exactly what was the basis for the 75%. And in regards to the earnings, I would just merely say that there was no vouchers, anything given that they directly paid for the expenses, and so therefore I think it should be included in the salary. And as far as the TTD, you will note that throughout that period of time the employer sent Mr. Lomolino to Dr. Fletcher. Fletcher ran him through EMGs. He ran him through a CT scan. Both EMGs were positive, by the way. And the only time they was able to get him a license to pass the DOT physical is once they sent him all the way down to one of their doctors down in St. Louis, and that was the date that the arbitrator found TTD to be terminated when they was finally able to get a doctor to say, well, now you can go back to truck driving. How they did that I don't know, but that's what they did because the employer – I mean, Mr. Lomolino stated he was on narcotic medication all the way up through arbitration, and how he would let him drive a truck. All that narcotic information is hard for me to understand in the facts. So with that, I would just ask that the award of 75% be reinstated. Thank you. Thank you, counsel. Do you want to – any response? I don't know if there are any questions. I mean, I really don't have anything to add to what Mr. Vance just said. Thank you. Okay, thank you. Thank you. Thank you, counsel. Both this matter will be taken under advisement. A written disposition shall issue.